# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================
## NO. 03-04-00030-CV
========================

**Cynthia Sue Vaughn, Appellant**

**v.**

**Joseph Patrick Vaughn, Appellee**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. FM101530, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This is an appeal from an order denying appellant Cynthia Vaughn's petition to enforce an agreed final divorce decree and her motion to modify the parent-child relationship. The district court rendered a final decree of divorce on June 22, 2001, and signed a qualified domestic relations order on September 27, 2002. In a subsequent action, Cynthia Vaughn complained that the qualified domestic relations order impermissibly altered the division of marital property set out in the divorce decree and, as a result, diminished her share of her former husband's retirement plans. She also alleged material and substantial changes in her financial status and argued for an increase in her child-support payments. The district court denied her petitions. We will affirm.

## BACKGROUND

Cynthia and Joseph Vaughn were married on February 20, 1988, and had three children together. Cynthia Vaughn is self-employed as a chiropractor and Joseph Vaughn is employed by Southwest Airlines. On March 5, 2001, after thirteen years of marriage, Joseph Vaughn filed for divorce based on standard no-fault grounds. *See* Tex. Fam. Code Ann. § 6.001 (West 1998). Both parties have since re-married to other individuals.

The district court rendered a final decree ("the Decree") on June 22, 2001, granting a divorce to the parties on the ground of insupportability, *see id.*, appointing the parties as joint managing conservators of their three children, *see id.* § 101.016 (West 2002), and dividing their marital estate. The Decree designated Cynthia Vaughn as the custodial parent with the exclusive right to establish the primary residence of the children within Travis and contiguous counties. *See id.* § 153.134(b)(1) (West 2002). Joseph Vaughn would pay $450.00 per month in child support, an amount previously agreed upon by the parties. Since June 22, 2001, the three children have lived with Cynthia Vaughn.

The Decree established each parent's rights to possession of the children. Memorializing a previous agreement between the parties, the Decree also provided that Joseph Vaughn, as part of his child-support obligation, would pay off a $17,866.90 marital debt from a loan taken against his Southwest Airlines 401(k) plan.[1] In exchange, the parties agreed that Joseph

---

[1] The circumstances concerning this loan are not a part of this record and are not at issue on appeal.

2

Vaughn's obligation to pay $450.00 per month in child support would not begin until May 1, 2005, at which point the loan would be paid off.

The Southwest Airlines 401(k) plan was one of two retirement accounts arising out of Joseph Vaughn's employment with Southwest Airlines that were part of the marital estate; the other was a Southwest Airlines Profit Sharing Plan. The Decree awarded Cynthia Vaughn a percentage of the community property portion of each retirement account, to be more specifically described in a "qualified domestic relations order" (QDRO):[2]

> IT IS ORDERED AND DECREED that the wife, CYNTHIA SUE VAUGHN, is awarded the following as her sole and separate property, and the husband is divested of all right, title, interest, and claim in and to that property:
>
> * * *
>
> 5.   A portion of JOSEPH PATRICK VAUGHN's retirement benefits in the Southwest Airlines 401(k) plan arising out of JOSEPH PATRICK VAUGHN's employment with Southwest Airlines, that portion being 40% and more particularly defined in a Qualified Domestic Relations Order.
>
> 6.   A portion of JOSEPH PATRICK VAUGHN's retirement benefits in the Southwest Airlines Profit Sharing Plan arising out of JOSEPH PATRICK

---

[2] A QDRO permits a non-employee former spouse to receive directly his or her share of retirement benefits from a retirement plan that is part of the marital estate. *See* Tex. Gov't Code Ann. § 804.001(4) (West 2004). These benefits would otherwise be paid to the plan participant (the employee former spouse). *Id.* A QDRO is a signed court order, directed to a retirement plan administrator, setting out in detail the information the administrator would need in order to calculate and send to each former spouse the correct amount of payment. *See id.* § 804.003(f). An order becomes "qualified" by containing statutorily required information, such as the name and address of the plan participant and the alternate payee (non-employee former spouse), the amount or percentage to be paid to each, or the method for calculating the amount to be paid, and the number of payments or period of time to which the order applies. *Id.* A party may petition a court to render a QDRO if the court that rendered a final decree of divorce did not provide a QDRO permitting payment of benefits to an alternate payee. Tex. Fam. Code Ann. § 9.103 (West 1998).

VAUGHN's employment with Southwest Airlines, that portion being 42.5% of the community portion of the Plan as of May 31, 2001 and more particularly defined in a Qualified Domestic Relations Order.[3]

* * *

The parties were unable to agree on the terms of the QDRO for over a year. On July 10, 2002, the district court held a contested hearing on Cynthia Vaughn's motion to enter a QDRO. The hearing primarily involved a determination of the amount of community property in Joseph Vaughn's Profit Sharing Plan as of May 31, 2001. Deborah Alexander, a certified public accountant, testified for Joseph Vaughn. Tracing the separate and community interests in the account, she determined that the total number of units of the Southwest Airlines Stock Fund on May 31, 2001, was 15,831.866.[4] Joseph Vaughn's separate property portion, after adjustments for splits and other changes, was 13,113.336 units. Subtracting Joseph Vaughn's separate property from the total number of units, Alexander determined that 2,718.530 units of the Southwest Airlines Stock Fund were community property. Applying Cynthia Vaughn's 42.5% interest in the Profit Sharing Plan to this amount, Alexander concluded that 1,155.375 units of Southwest Airlines Stock Fund were Cynthia Vaughn's separate property. The Profit Sharing Plan also included two other funds, a MAS Balanced Portfolio Fund and a Harbor Capital Appreciation Fund, that were entirely community property.

---

[3] The Decree confirmed that 1,625.255435 shares of common stock in Southwest Airlines Profit Sharing Plan were Joseph Vaughn's separate property.

[4] Alexander testified that Southwest Airlines converted from shares to units in the quarter ended September 30, 1995, to facilitate investment within the fund, creating the equivalent of a mutual fund that held all the plan's investments as of the date of the conversion. She further testified that the conversion rate between shares and units was not one to one.

The district court signed a QDRO on September 27, 2002, which, in relevant part, assigned to Cynthia Vaughn, as Alternate Payee, the following benefits:

a. SOUTHWEST AIRLINES CO. PROFIT SHARING PLAN:

Alternate Payee is hereby assigned 2.975 units in the MAS Balanced Portfolio Fund, 0.657 units in the Harbor Capital Appreciation Fund, and 1,155.375 units in the Southwest Airlines Stock Fund which represents Alternate Payee's 42.5% percent of "the community property portion" of Participant's Profit Sharing Plans Account as of May 31, 2001.

b. SOUTHWEST AIRLINES CO. 401(k) PLAN:

Alternate Payee is hereby assigned 40% of Participant's 401(K) Plan as of the date of May 31, 2001 before reduction for any outstanding loan to Participant from the Plan, such amount to be taken pro rata from each investment fund in which Participant's 401(K) Plan account balance is invested on May 31, 2001, other than the Participant's loan fund, if any;

including earnings thereon and less losses thereon from May 31, 2001, which are segregated, assigned and transferred to the exclusive beneficial interest of Alternate Payee.

The QDRO was accepted by the Southwest Airlines plan administrator and became final on October 27, 2002.

Between May 31, 2001, and November 2002, the stock market had experienced a devaluation that decreased the value of the plan units that Cynthia Vaughn ultimately received under the QDRO. When distributions were made in November 2002, she received $88,842.85 from the plan administrator, $63,643.41 less than the value of her units when the Decree was entered. Contending that she was entitled to the dollar value of the units at the time the Decree was entered, Cynthia Vaughn filed a petition for enforcement on December 16, 2002, seeking to amend the

5

QDRO to reflect the value of retirement benefits at the time the Decree was entered rather than the number of shares in each plan.

At the same time, Cynthia Vaughn filed a Petition to Modify Parent-Child Relationship seeking to increase child support payments based on alleged substantial and material changes in her financial status. *See id*. § 156.401(a)(1) (West 2002). She asked the district court to award her, in lieu of the amount of child support in the Decree, the amount of statutorily derived child support to which she would be presumptively entitled[5]—which, based on Joseph Vaughn's salary at that time, was determined to be $1,176.56 per month. Of this amount, $450 would continue to go toward repayment of the marital loan on the 401(k) plan, with $726.56 each month going directly to Cynthia Vaughn for child support.

The district court held a hearing on both petitions on October 3, 2003. Cynthia Vaughn testified that, before the divorce, she had worked as an associate chiropractor in another area chiropractor's clinic and had received a salary. In 1998, she purchased her own clinic. At the time of the divorce, she was averaging about $113,000 in salary per year from her practice. In October 2001, several months after the divorce, she relocated her clinic. She admitted that she failed to do any marketing for this new location. She subsequently experienced a slow but steady decline in the number of patients she saw but continued to work the same number of hours.

At first, Cynthia Vaughn continued to pay herself the salary she had been accustomed to receiving as a salaried employee, drawing on a line of credit extended to her clinic. At the time of her testimony, she had reached the limit of this line of credit, as well as the credit limits of her

---

[5] *See* Tex. Fam. Code Ann. § 154.125(b) (West 2002).

personal credit cards; she owed $42,000 on the line of credit and $40,000 on her credit cards. By the time of the hearing, she was paying herself a salary of about $2,462 per month. Her new husband, who was also a chiropractor and to whom she had sold a half-interest in the clinic, was receiving half of the net income generated by the practice. Through September 2003, he had earned $12,750, and she had earned $19,700 from the clinic's profits for the calendar year. During the previous year, her husband had received only $100 from the clinic.

Cynthia Vaughn had taken several measures to improve marketing and increase her patient base. She had taken out a larger advertisement in the phone book, and she and her staff had received telephone coaching and have begun sending advertisements to new residents of Austin. She joined a management practice company, which she and her staff attended several times a year for extensive training. At the time of the hearing, these changes had yielded a modest impact on her practice, but she had a positive outlook for her clinic for the future. Furthermore, her average monthly expenses had declined from $7,868.78 per month in 2001 to $6,466.77 per month in 2003.

Cynthia Vaughn traveled out of town on several occasions between July 26, 2001, and December 5, 2002. Much of the travel was work-related and within Texas. She and her staff attended a weekend training session held by the management practice company she had joined. She also attended continuing education classes and took several trips in connection with her membership on the National Board of Chiropractic Examiners. Her chiropractic clinic covered the expenses of any travel that was work-related or for continuing education. The U.S. Department of Veterans Affairs reimbursed her for two trips she made to Washington, D.C.

She continued to travel in 2003. In January, she and her husband took her children on a cruise to the Western Carribean. In February, they went skiing, using Southwest Airlines Rapid Rewards points to purchase the plane tickets. Her new husband paid most of the expenses of these trips. At the time, her husband received a salary of $2,500 per month from his position with the American Chiropractic Association. He no longer holds this position, and his only current source of income is his work at the chiropractic clinic. When Cynthia Vaughn and her husband are away from the clinic, they hire someone to cover the practice, whom they pay $200 per day.

Joseph Vaughn also testified at the hearing. At the time of the divorce, he received a monthly salary of approximately $5,025 from his employment with Southwest Airlines. Joseph Vaughn contributed $469.52 per month to his 401(k) plan and paid $700 per month on his vehicle note.[6] His monthly expenses exceeded his monthly income by about $2,500.

Southwest Airlines had recently offered him a position that would have required him to relocate. Joseph Vaughn turned down the position because he wanted to stay in Austin to be near his children. As a result, Southwest Airlines placed him in an hourly position that paid significantly less than what he could have been making. In his new position, he has few opportunities to work overtime.

At the time of the hearing, Joseph Vaughn was paying temporary child support pursuant to a court order. Before the temporary support payments, he had provided several hundred

---

[6] At the hearing, Cynthia Vaughn testified that Joseph Vaughn had repaid the loan they had taken on his 401(k) plan.

dollars for his children each month in addition to the $450.00 he paid on the loan on his 401(k) plan. Joseph Vaughn visited with his children regularly.

The district court denied Cynthia Vaughn's petitions. This appeal followed.

## DISCUSSION

On appeal, Cynthia Vaughn raises two issues, challenging the district court's refusal to grant her petition for enforcement seeking to amend the QDRO and its denial of her petition to modify the parent-child relationship seeking increased child support payments. We will address each in turn.

**Petition for enforcement of final divorce decree**

In her first issue, Cynthia Vaughn argues that the district court erred in refusing to grant her petition for enforcement, in which she had asked the court to amend the language of the QDRO to reflect the value of retirement benefits at the time of the Decree's entry. In particular, she asserts that the QDRO improperly changed the parties' agreed division of their marital estate memorialized in the Decree. *See* Tex. Fam. Code Ann. § 9.007(a). She claims that the Decree unambiguously provided that her share in the Southwest Airlines retirement plans would be determined as of May 31, 2001. She argues that the decree effectively established May 31, 2001, as a "valuation cut-off date," on which date the plan administrator would calculate the amounts due to her under the plans by applying her percentage interest in each account to the total value of each plan on that date. She believed that any fluctuations in the equity value of these accounts occurring after May 31, 2001, would not affect the dollar amount distributed to her from the accounts. She

9

further contends that the QDRO, which was accepted by the plan administrator on October 27, 2002, improperly included the language, "including earnings thereon and less losses theron from May 31, 2001, which are segregated, assigned, and transferred to the exclusive beneficial use of" Cynthia Vaughn. She asserts that this language conflicts with the clear and unambiguous terms of the Decree and improperly alters the substantive division of property made in the Decree.

An agreed divorce decree implementing an agreed property division is controlled by the rules of construction applicable to ordinary contracts. *Allen v. Allen*, 717 S.W.2d 311, 312 (Tex. 1986); *Harvey v. Harvey*, 905 S.W.2d 760, 764 (Tex. App.—Austin 1995, no writ). If a divorce decree is unambiguous, the court has no authority to alter or modify the original disposition of property. *Haworth v. Haworth*, 795 S.W.2d 296, 300 (Tex. App.—Houston [14th Dist.] 1990, no writ). Whether an ambiguity exists in an agreement is a question of law, which we review *de novo*. *National Union Fire Ins. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *Bishop v. Bishop*, 74 S.W.3d 877, 880 (Tex. App.—San Antonio 2002, no pet.). Conflicting interpretations or expectations of the parties regarding the contract do not create an ambiguity. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994). Rather, a contract is ambiguous if its meaning is uncertain or it is reasonably susceptible to more than one meaning. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

The family code authorizes actions to either enforce a prior divorce decree or to clarify an ambiguous decree. *See* Tex. Fam. Code Ann. §§ 9.006-.008 (West 1998). A court may render orders to enforce the division of property made in the decree "to assist in the implementation of or to clarify the prior order." *Id.* § 9.006(a). If the district court finds the original division of

10

property ambiguous or not specific enough to be enforceable by contempt, it may enter a clarifying order to enforce compliance with original division of the property. *Id.* § 9.008(b).

Furthermore, a party may petition a court to render a QDRO if the court that rendered a final decree of divorce dividing the marital property did not provide a QDRO. *Id.* § 9.103 (West 1998). However, a court may not amend, modify, alter, or change "the division of property made or approved in the decree," and an "order to enforce the division is limited to an order to assist in the implementation of or to clarify the prior order." *Id.* § 9.007(a); *see also Marshall v. Priess*, 99 S.W.3d 150, 157 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Such orders may more precisely specify the manner of carrying out the property division previously ordered so long as the substantive division of the property is not altered. *Dechon v. Dechon*, 909 S.W.2d 950, 956 (Tex. App.—El Paso 1995, no writ). Altering the substantive division of property made in a final divorce decree is beyond the power of the district court, and such a change is unenforceable. Tex. Fam. Code Ann. § 9.007(b); s*ee also Haworth*, 795 S.W.2d at 300 ("Because we have found the original decree unambiguous, the trial court had no authority to enter an order modifying the original disposition of property.").

The Decree itself did not indicate whether Cynthia Vaughn would be awarded a percentage of the units or a percentage of the market value of each plan as of May 31, 2001.[7] Moreover, it expressly contemplated that a QDRO would be entered to effectuate the division of property specified in the decree. Specifically, it stated that distributions made to Cynthia Vaughn

---

[7] Only paragraph 6 of the Decree, relating solely to the Profit Sharing Plan, referenced the May 31, 2001, date. Cynthia Vaughn argues that the Decree established May 31, 2001, as the "valuation cut-off date" for both plans.

11

from the retirement plans would be "more particularly defined in a Qualified Domestic Relations Order."

The QDRO entered by the court can properly be viewed as a clarifying order. *See* Tex. Fam. Code Ann. § 9.008(b); *Alford v. Alford*, 40 S.W.3d 187, 189 (Tex. App.—Texarkana 2001, no pet.). The QDRO did not alter the substantive division of property made in the divorce decree—it did not change the date on which Cynthia Vaughn's interests in the plans would be calculated, nor did it change the percentage share that she would received from the plans. The QDRO merely clarified that Cynthia Vaughn was to receive units from the Profit Sharing Plan representing 42.5% of the community portion of that plan as of May 31, 2001. The QDRO clarified that the value of Cynthia Vaughn's awarded units would fluctuate with the market after May 31, 2001.

The QDRO incorporated the parties' agreement by providing that Cynthia Vaughn's share of the retirement plans would be calculated by applying a certain percentage to each account. Moreover, the Decree itself had stipulated that a QDRO be entered to effectuate and "more particularly define" this division. The QDRO therefore served its intended purpose of implementing and clarifying the division of benefits set out in the original decree and did not impermissibly "amend, alter, modify, or change the division of property made or approved in the decree of divorce." *See* Tex. Fam. Code Ann. § 9.007(a). We overrule Cynthia Vaughn's first issue.

**Petition to modify parent-child relationship**

In her second issue, Cynthia Vaughn argues that the district court erred in denying her petition to modify parent-child relationship because the evidence adduced at trial

overwhelmingly proved a material and substantial change in her economic circumstances since the entry of the last order governing her child support. In particular, she argues that the district court abused its discretion by failing to make findings under the three-step statutory procedure for setting child support. *See id.* § 154.125(b) (West 2002); *Sanchez v. Sanchez*, 915 S.W.2d 99, 102 (Tex. App.—San Antonio 1996, no writ). She also argues that a modification is in the best interest of her children.

### *Section 154.125(b) findings*

First, Cynthia Vaughn argues that the district court erred by failing to make statutory findings when denying her petition to modify. By implication, she also argues that the district court abused its discretion in failing to analyze the statutory guidelines for setting child-support payments. *See* Tex. Fam. Code Ann. § 154.125(b); *Sanchez*, 915 S.W.2d at 102.

When initially setting child support payments, a court must consider and make findings under the statutory guidelines. Tex. Fam. Code Ann. § 154.125(b); *Sanchez*, 915 S.W.2d at 102. However, parties may make an agreement as to child-support amounts outside the guidelines. Tex. Fam. Code Ann. § 154.124(a) (West 2002). If a court finds the agreement to be in the child's best interest, it shall enter an order in accordance with the agreement. *Id.* § 154.124(b).

It is within the district court's discretion whether to file findings when ordering or rendering child support. *In re D.S.*, 76 S.W.3d 512, 522 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (trial court's findings only required when amount of child support ordered or rendered varies from guidelines); *see also* Tex. Fam. Code Ann. § 154.130 (West 2002). No findings of fact are required in a modification hearing unless there are disputed fact questions over ultimate controlling

13

issues. *In re Striegler*, 915 S.W.2d 629, 635 (Tex. App.—Amarillo 1996, writ denied). A denial of a motion to modify child support is not an order. *In re D.S.*, 76 S.W.3d at 522 (court merely denied motion to modify agreed order; it did not issue or render new child support order). There are no disputed fact questions regarding ultimate controlling issues in this case. Because this appeal arises from a denial of a petition to modify rather than from an order setting child support, the district court did not abuse its discretion in refusing to make child-support findings when denying a request to modify. *See id.*

A district court may consider the child support guidelines to determine whether there has been a material or substantial change of circumstances "that warrants a modification of an existing child support order if the modification is in the best interest of the child." Tex. Fam. Code Ann. § 156.402(a) (West 2002). If the amount of support contained in the order does not substantially conform with the guidelines for single and multiple families under chapter 154 of the family code, the court "*may* modify the order to substantially conform with the guidelines if the modification is in the best interest of the child." *Id.* § 156.402(b) (Emphasis added.). A court may also consider other relevant evidence in addition to the factors listed in the guidelines. *Id.*

Given the evidence in this case, it was within the district court's discretion to determine that there was not a material and substantial change. Therefore, it was within its discretion to deny the petition to modify.

### *Denial of modification petition*

Finally, Cynthia Vaughn argues that the district court erred because modification would be in the best interest of the children. A district court may modify a child support order upon

14

a showing that the circumstances of the children affected by the order have materially and substantially changed since the order was signed. Tex. Fam. Code Ann. § 156.401(a)(1). The district court is accorded broad discretion in setting and modifying child support payments and, absent a clear abuse of discretion, the court's order will not be disturbed on appeal. *In re P.J.H.*, 25 S.W.3d 402, 405 (Tex. App.—Forth Worth 2000, no pet.); *Hoffman v. Hoffman*, 805 S.W.2d 848, 851 (Tex. App.—Corpus Christi 1991, writ denied); *see also DuBois v. DuBois*, 956 S.W.2d 607, 610 (Tex. App.—Tyler 1997, no pet.). The test for an abuse of discretion is whether the district court acted without reference to any guiding legal principles, in other words, whether it acted arbitrarily or unreasonably. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Pecht v. Pecht*, 874 S.W.2d 797, 800 (Tex. App.—Texarkana 1994, no writ).

Under an abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds for error but are relevant considerations in evaluating whether there was an abuse of discretion. *Pecht*, 874 S.W.2d at 800. In making that determination, we view the evidence in the light most favorable to the district court's decision and indulge every legal presumption in favor of the decision. *Tucker v. Tucker*, 908 S.W.2d 530, 532 (Tex. App.—San Antonio 1995, writ denied). If there is some probative, substantive evidence to support the district court's decision, there was no abuse of discretion. *Id*.

In a modification proceeding, the court compares the financial circumstances of the child and the affected parties at the time the support order was entered with their circumstances at the time the modification is sought. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, writ denied). The movant has the burden to show a material and substantial change

15

by a preponderance of the evidence. *Id*. The best interest of the child should always be the district court's primary consideration. *See* Tex. Fam. Code Ann. § 156.402(b). The obligor's ability to pay is also a factor for the court to consider. *See*, *e.g.*, *Smith v. Smith*, 143 S.W.3d 206, 217 (Tex. App.—Waco 2004, no pet.) (each parent should support child commensurate with his or her ability to pay, but obligation should not be so great as to deny that party necessary expenses of living). A parent's reduction in income may give a court a reason to modify child support. *See In re D.S.*, 76 S.W.3d at 520 (voluntary underemployment is factor court may consider in modification); *In re Davis*, 30 S.W.3d 609, 616-17 (Tex. App.—Texarkana 2000, no pet.); *Woodall v. Woodall*, 837 S.W.2d 856, 858 (Tex. App.—Houston [14th Dist.] 1992, no writ); *Casterline v. Burden*, 560 S.W.2d 499, 501 (Tex. Civ. App.—Dallas 1977, no writ).

Joseph Vaughn's income has remained relatively the same since the time of the decree. His monthly expenses exceed his income by more than two thousand dollars. His new wife helps him with these expenses. Cynthia Vaughn's income has decreased in large part because she sold half her interest in the chiropractic clinic to her new husband. She also sees fewer patients. Still, her earnings potential from her clinic, in light of both her previous salary and her increased marketing efforts, is positive, and she expects, by her own admission, "an upward trend" in her business. The district court was able to consider all the evidence and was in the position to observe the demeanor of the parties in light of the best interests of the children. Given the complex nature of the ongoing relationships in this case and the changing financial situations of all the parties, we are unable to conclude that the district court abused its discretion in denying Cynthia Vaughn's request for modification. We overrule Cynthia Vaughn's second issue.

**CONCLUSION**

We have overruled Cynthia Vaughn's issues on appeal. We affirm the district court's order denying the petition to enforce and the petition to modify.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed:   May 12, 2005